# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| ALBERTA WILSON, )<br>on behalf of J.G., )<br>  )<br>  Plaintiff, )<br>  )<br>v. )<br>  )<br>NANCY A. BERRYHILL, )<br>Acting Commissioner )<br>Of Social Security, )<br>  )<br>  Defendant. ) | Case No. 4:16-cv-00465-NKL |

## ORDER

Plaintiff Alberta Wilson appeals the Commissioner of Social Security's final decision denying the application of her child, J.G., for supplemental security income under Title XVI of the Social Security Act. The decision is reversed and the case is remanded for further proceedings.

**I.  Background**

J.G. is a minor with an alleged disability onset date of September 30, 2005 (his date of birth). The Administrative Law Judge held a hearing on May 27, 2014 and a supplemental hearing on October 6, 2014, and denied the application for benefits on January 23, 2015. The Appeals Council denied review on March 23, 2016. Wilson's appeal to this Court on behalf of J.G. involves the ALJ's evaluation of the opinion of one of J.G.'s teachers concerning the severity of his impairments, and the finding regarding J.G.'s ability to acquire and use information.

**A.  J.G.'s medical history**

J.G. was born prematurely. He has been treated for asthma since at least 2009 and

attention deficit hyperactivity disorder (ADHD) since at least 2012.

In October 2012, Catherine Benitez, M.D., J.G.'s primary care physician, reviewed questionnaires (referred to as "Vanderbilt forms") filled out by J.G.'s teacher and mother. The results were consistent with ADHD and oppositional defiant disorder. Dr. Benitez prescribed Concerta, 18 m.g., and referred J.G. for counseling.

In November 2012, J.G.'s mother reported that he was "doing pretty well" and "doing better" on the Concerta, although he still got into problems "every once in awhile." Tr. 510. Dr. Benitez renewed the prescription.

J.G. next saw Dr. Benitez in March 2013. J.G. was taking the Concerta and doing well in school during the first part of the day, but after a few hours would be inattentive and hyperactive. In the record of the visit, the doctor noted under the subheading "Constitutional" that J.G.'s "overall appearance [was] hyperactive" and under the subheading "Psychiatric" that J.G. "behave[d] appropriately for age." Tr. 529. The doctor renewed the Concerta.

J.G. and his family moved from Michigan to Missouri in August 2013. In April 2014, he was seen at Children's Mercy Pediatric Clinic to establish care for ADHD and asthma. He was prescribed Concerta, 36 m.g., and Vanderbilt forms were provided for his parents and teachers to fill out.

In July 2014, J.G. returned to Children's Mercy Pediatric Clinic. His mother reported that J.G.'s teacher noticed a difference with the Concerta, but the medication seemed to wear off in the afternoons. The doctor renewed the prescription and provided Vanderbilt forms to be filled out for the start of the coming school year.

Dr. Hannah Johnson saw J.G. for follow up in August 2014 for ADHD and asthma. J.G. had begun the school year and the teacher had been calling J.G.'s mother to report that he was getting out of his seat and leaving class. Dr. Johnson renewed the Concerta. At a follow up the

next month, the doctor renewed the Concerta.

J.G. was seen at Truman Medical Center in September 2014 by Lisa Wolfe, Licensed Qualified Mental Health Professional, to establish services for ADHD treatment in the medication clinic. He was also referred to psychiatry due to temper outbursts, impulsivity, difficulty focusing, and high activity level.

In October 2014, J.G. saw Christopher Stone, M.D. in the ADHD Screening Clinic at Children's Mercy. During the visit, Dr. Stone noted that J.G. "was quiet for awhile with minimal interruptions, sat for awhile then moved around a bit during the visit" and that he was "cooperative" and displayed "normal mood and affect[.]" Tr. 600. Dr. Stone noted "negative" under both "Constitutional" and "Psychiatric" in the record of the exam. Tr. 598-99. J.G.'s diagnoses included ADHD, aggressiveness, expressive language disorder, and oppositional defiant disorder. The doctor renewed the Concerta, 36 m.g., for one month and noted that J.G.'s care would be transferred to a psychiatrist at Truman Medical Center Behavioral Health.

**B.     J.G.'s school history**

J.G. was in second grade in the 2013-2014 school year and had an Individualized Educational Plan (I.E.P.) assessment in November 2013. His medical diagnoses of ADHD and asthma were noted. His teachers indicated that he frequently instigated negative interaction with his peers, had difficulty following adults' instructions, and exhibited negative reactions by throwing chairs, yelling, crying, and refusing to work. His inadaptability, behavioral symptoms, anxiety, conduct problems, aggression, and hyperactivity were assessed as clinically significant. Testing showed cognitive ability in the low-average range; a deficit in processing speed; significantly inappropriate behavior; motor skills in the low range and discrepant from his cognitive ability; academic achievement in the sixth percentile and consistent with grade level 1; deficits in all areas of reading ability; poor written expression skills; and below-average skills in

math. Tr. 271-72.

Based on observations of J.G. in different environments, an in-depth social history, and the testing, "a group of qualified professionals and the parent(s) determined that [J.G. met] the Missouri Department of Education Special Education eligibility criteria for Emotional Disturbance." Tr. 272.[1] His I.E.P. provided that he would participate in a regular classroom for about 12% of the school day. Full-time participation was not appropriate because of his level of frustration and the need to master his I.E.P. goals. Tr. 222. The I.E.P. provided for accommodations in the form of extra time to complete tests, taking tests in small groups, being given oral instead of written exams, special seating in the classroom, extended work time, repeated reviews, frequent reminders of rules, frequent breaks, preferential seating in the classroom, and the opportunity for a setting separate from his usual classroom for calming down. J.G. was also provided occupational therapy services for problems with handwriting.

In December 2013, J.G. had a two-day, out-of-school suspension for fighting, and in March 2014 had a three-day, out-of-school suspension for chronic misconduct. Progress ratings recorded in his I.E.P. reflect that on 3/25/2014 and 5/15/14 that J.G. was "[n]ot making sufficient progress" on behavior goals and his teachers did "not anticipate [J.G.] meeting" them. Tr. 232. In total, J.G. missed 18 days of school during the second grade.

On his May 2014, year-end report card, his special education teacher, Donna Carter,

---

[1] The I.E.P. explains that "Emotional Disturbance" is "a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance":

- an inability to learn that cannot be explained by intellectual, sensory, or health factors;
- inappropriate types of behavior or feelings under normal circumstances;
- a tendency to develop physical symptoms or fears associated with personal or social problems.

Tr. 272.

4

noted "Needs improvement" under all areas of Academic Foundation (e.g., persistence, self-discipline, following directions, sense of responsibility to others), Math, and Social Studies, and under "Comments" noted that he needed to improve self-control, lacked interest in work, lacked effort, did not show an interest in school, and did not work at grade level. Tr. 199-201. His grades in Communications and Math declined from C's to a D by the end of the school year, and in Science declined from A's to a C. His Computer teacher noted that he was self-challenging and progressing; his Music teacher commented that he grasped new ideas easily; and his Physical Education teacher noted he had good participation in class. Tr. 200-01.

The following school year, when J.G. was in third grade, it was determined that he continued to meet Missouri's eligibility criteria for Emotional Disturbance. His November 2014 I.E.P. indicates that he repeatedly asks to call his mother or begins crying if he cannot talk to her; will attempt to walk out of the classroom or stand outside of the classroom door; has a hard time letting go if he feels he has been wronged; and that his emotions and reactions affect his academics. He had not had a suspension from the bus or school since the prior year; had improved his attendance, computation skills, handwriting; and was learning how to manage his reactions to situations without verbal or physical aggression. The I.E.P. contained goals for handwriting, reading, math, behavior, and socialization, and provided that J.G. could not participate in a regular classroom 100% of the time. Modifications and accommodations included oral rather than written exams, extended time for exams, preferential seating, repeated reviews and drills, and "frequent eye contact/proximity control[.]" Tr. 471. The I.E.P. contains November 2014 progress ratings on annual goals: J.G. was "making progress" in handwriting, "making slow progress" in reading and math goals, and "making progress" in behavior goals. Tr. 476-80.

### C. Wilson's hearing testimony

Wilson testified at both hearings before the ALJ. In May 2014, she testified that she received daily texts from J.G.'s teachers about his misbehavior and inattention; that she had to pick him up from school once per week on average; and that he endangered himself by running away from his classroom and his home for hours at a time. In October 2014, she testified that he ran in and out of his classroom, but later clarified that he had run out of the school once. She stated that he fought with and bit his teacher, and had some problems fighting with and pushing his classmates which led to him being sent to the buddy room for behavior management under the supervision of another teacher.

### D. Opinion evidence

#### 1. The State of Michigan Disability Determination Service

J.G. had a consultative evaluation in January 2013 by Neil Reilly, M.A. for the State of Michigan's Disability Determination Service.[2] In the History portion of the report, Reilly noted that J.G. was in first grade and receiving full-time special education services for behavior and learning problems, and speech and language delays. Reilly stated that it was "too early to tell if there are learning disabilities." Tr. 517. In the Mental Status Examination portion of the report, Reilly noted that J.G. was a little fidgety; he appeared to have a good relationship with his mother and her boyfriend; he demonstrated appropriate judgment; and his mood appeared to be within normal limits. Under "Dynamic formulation," Reilly noted that J.G. "[s]cholastically continues to struggle and gets a lot of special interventions." Tr. 521. Reilly listed diagnoses of "mood disorder NOS"; "ADHD—predominantly inattentive type"; and Communication disorder

---

[2] The Michigan DDS invoice for the evaluation lists Neil J. Reilly, M.A., Tr. 516, and Reilly's name and address appear on the first page of the report, Tr. 517. The final page of the report is signed by Reilly, whose signature block states he is a "Limited Licensed Psychologist." Tr. 521. The final page also contains the signature of a "James Lozer, Ed.D.," whose signature block states he is a "Licensed Psychologist." *Id.*

NOS ([history] of speech and language services)," among others. *Id.* Under "Prognosis," Reilly stated that J.G.'s issues with learning and mood were being treated with medication and special education school placement, and that J.G. was likely to require intervention and special services for some time. *Id.* The ALJ gave significant weight to the Mental Status findings and little weight to the opinions. Tr. 22. In stating that the opinions would be given little weight, the ALJ noted that Reilly was not a fully licensed psychologist. *Id.*

### 2. State agency consultants

Shanthini Daniel, M.D., a pediatrician, and William Schirado, Ph.D., a psychologist, are State agency (Michigan DDS) consultants who reviewed J.G.'s file in January 2013, including the Reilly consultative evaluation. Dr. Daniel offered the opinions that J.G. had "no major motor delay/deficit alleged or noted" and "is growing well…[and] needs to avoid allergens, triggers and pulmonary irritants[.]" Tr. 72. Dr. Schirado opined that J.G. had no limitations in "Acquiring and Using Information." Tr. 71-72. He further opined that J.G. had "less than marked" limitations in "Attending and Completing Tasks," noted J.G.'s diagnosis of ADHD, and noted that Reilly's consultative evaluation was consistent with "mild findings—partially supported allegations re severity/limitations[.]" Tr. 72. The Determination section of the reviewing consultants' report states:

> We realize [J.G.] struggles in some areas due to his conditions. The medical information shows that he is receiving help for his breathing, attention, and learning difficulties. While he may need special consideration at times, overall, [J.G.] is able to complete simple tasks, interact appropriately with others and communicate adequately. We have determined that [J.G.]'s condition is not disabling at this time because it does not significantly interfere with his ability to function.

Tr, 74.

### 3. Donna Carter

Donna Carter, J.G.'s second-grade, special education teacher, completed an Individual

Functional Assessment form in April 2014. Tr. 193-94. The form lists six domains[3] and directs the rater to compare the child to other children of the same age, who do not have limitations. Each domain includes bulleted definitions, a space for the evaluator to write in comments, and boxes to check to indicate "Extreme," "Marked," "Less than Marked," or "No Limitations." Tr. 193-94. The form defines an "Extreme" limitation as one that:

> [I]nterferes very seriously with ability to independently initiate, sustain or complete activities. This does not necessarily mean a total lack of or loss of ability to function. It is the equivalent of the functioning from standardized testing with scores that are at least three standard deviations below the mean.

Tr. 193. A "Marked" limitation is defined as one that:

> [I]nterferes seriously with ability to independently initiate, sustain, or complete activities. It is the equivalent of the functioning from standardized testing with scores that are at least two standard deviations below the means.

*Id.*

Carter checked "Extreme" with respect to four domains, listed below, and wrote notes in the Comments sections:

1. Acquiring and Using Information
   - Able to learn to read, write and do arithmetic,
   - Able to discuss history and science,
   - Able to use increasingly complex language to share information and ideas with individuals or groups, by asking questions and expressing his/her own ideas, and by understanding and responding to the opinions of others.

   Comments: *Struggles with academics due to behavior[.]*

2. Attending and Completing Tasks
   - Able to focus his/her attention in a variety of situations in order to follow directions, remember and organize his/her school materials, and complete classroom and homework assignments.
   - Able to change activities or routines without distracting

---

[3] The six domains were the same functional domains found in 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

8

>  > self or others, and stay on task and in place when appropriate.
>  > - Able to concentrate on details and not make careless mistakes on work.
>  > - Able to complete a transition task without extra reminder and accommodation.
>  >
>  > Comments: *Struggles with following directions from adults.*
>
> 3. Interacting & Relating With Others
>    - Able to develop more lasting friendships.
>    - Able to understand how to work in groups to create projects and solve problems.
>    - Has an increasing ability to understand another's point of view and to tolerate differences.
>    - Able to talk to people of all ages to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.
>
>    Comments: *Cannot focus within a group for very long.*
>
> \*\*\*
>
> 5. Caring for Yourself
>    - Independent in most day to day activities, with occasional reminders.
>    - Begins to develop understanding about right and wrong, and what is acceptable and unacceptable behavior.
>    - Begins to demonstrate consistent control over his/her behavior and able to avoid behaviors that are unsafe or otherwise not good for you.
>
>    Comments: *Trouble controlling behavior/anger[.]  Feels that he is always right even when he is wrong[.]*
>
> \*\*\*

Tr. 193-94.

Carter checked "Less Than Marked" with respect to the remaining two domains—"4. Moving About and Manipulating Objects" and "6. Health and Physical Well-Being." Tr. 194.

### E.  The ALJ's decision

The ALJ found that J.G. was not engaged in substantial, gainful activity; has severe

9

impairments of asthma and ADHD; and does not have any impairment or combination of impairments that meets or medically exceeds the severity of a listed impairment.

The ALJ further found that J.G. does not have an impairment or combination of impairments that functionally equals the severity of the listings. Specifically, with respect to the six functional domains, 20 C.F.R. § 416.926a(b)(1), the ALJ found as follows:

1. Acquiring and using information—no limitations;
2. Attending and completing tasks—less than marked limitations;
3. Interacting and relating with others—less than marked limitations;
4. Moving and manipulating objects—no limitations;
5. Caring for oneself—no limitations; and
6. Health and physical well-being—less than marked limitations.

Tr. 23-29. The ALJ concluded that J.G. was not entitled to benefits.

## II. Discussion

Wilson argues that although a teacher is not an acceptable medical source, the opinion of a teacher must nevertheless be properly weighed and considered, and the ALJ failed to do so with respect to the opinion of J.G.'s teacher, Donna Carter. Wilson also argues that there is not substantial evidence on the record to support the ALJ's decision that J.G. had no limitations in the domain of acquiring and using information. Wilson asks for reversal of the decision and remand for a new hearing.

### A. Standard of review

A court's role on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *Rucker v. Apfel,* 141 F.3d 1256, 1259 (8th Cir. 1998). Substantial evidence is less than a preponderance but enough that a reasonable mind would find the evidence adequate to support the ALJ's conclusion. *Collins ex rel. Williams v. Barnhart*, 335 F.3d 726, 729 (8th Cir. 2003). As long as there is substantial evidence to support the Commissioner's decision, a court may not reverse it because substantial evidence also exists in the record that would have supported a contrary outcome,

*Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002), or because the court would have weighed the evidence differently, *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000) (citation omitted).

    B.    **Standard for determining a child's disability**

A child is "disabled for purposes of [SSI] if [he] has a medically determinable physical or mental impairment, which results in marked and severe functional limitations" that has lasted or can be expected to last for at least twelve months or result in death. 42 U.S.C. § 1382c(3)(C)(i). In making the determination, the ALJ applies a sequential, multi-step test, asking:

1. Is the child engaged in substantial gainful activity?
2. If not, does the child have an impairment or combination of impairments that is severe?
3. If so, do those impairments meet or "medically equal" an impairment listed in the regulations?
4. If not, do the impairments "functionally equal" an impairment listed in the regulations?

20 C.F.R. § 416.924(a); 20 C.F.R. pt. 404, subpt. P, app. 1, pt. B.

At step four, functional equivalence, the ALJ considers how the child's impairment or combination of impairments has affected his abilities within six broad domains of functioning. Together, these domains are "intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1).

To determine whether the child is experiencing "marked" or "extreme" limitations in the domains, the ALJ must review all the evidence in the record and compare the child's functioning to "the typical functioning of children [the child's] age who do not have impairments." 20 C.F.R. § 416.926a(f)(1). *See also* 20 C.F.R. § 416.924a(b)(5)(ii); 20 C.F.R. § 416.926a(b). The ALJ considers "the effects of structured or supportive settings," how the child functions in

11

school, and the effects of the child's medications, if any. 20 C.F.R. § 416.926a(a)(1)-(3). A child's impairments will be found to "functionally equal" the impairments listed in the regulations if they cause the child to have "marked" limitations in at least two of the domains or an "extreme" limitation in at least one domain. 20 C.F.R. § 416.926a(d). A child has a "marked" limitation in one of these domains when an "impairment interferes seriously with his ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A child has an "extreme" limitation when an "impairment interferes very seriously with his ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). There may be "marked" or "extreme" limitations in only one activity or in several activities as a result of the interactive and cumulative effects of the child's impairments. 20 C.F.R. § 416.926a(e)(2)-(3).

### C. The ALJ's analysis of the teacher's opinion

Donna Carter, J.G.'s second grade, special education teacher, completed an Individualized Functional Assessment form in April 2014, in which she opined that J.G. was extremely limited in four domains—acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself, and had less than marked limitations in the other two domains—moving about and manipulating objects, and health and physical well-being. The ALJ gave Carter's opinion "no significant weight." Tr. 21. The ALJ explained: (1) Carter was not an acceptable medical source; (2) Carter provided opinions on issues reserved to the Commissioner; (3) Carter's opinion that J.G. was extremely limited in acquiring and using information was inconsistent with J.G.'s promotion to third grade, the computer teacher's observation that J.G. was self-challenging and progressing with computer usage, and Carter's comment that J.G. "struggles with academics due to behavior"; and (4) Carter's opinion that J.G. had less than marked limitations in moving about and manipulating

objects was inconsistent with J.G.'s athleticism. *Id.* Wilson argues that the ALJ's reasons for giving Carter's opinion no significant weight were insufficient. The Court agrees.

First, the fact that Carter is not a medical source does not mean her opinion is entitled to no weight. In determining disability for children, the Commissioner must consider all relevant information in the record, including information from non-medical sources such as parents and teachers. 20 C.F.R. § 416.924a(a). *See also* 20 C.F.R. § 416.913 (although teachers are not "acceptable medical sources," they are "other sources" whose opinions can be considered). Furthermore, Social Security Ruling (SSR) 06–3p provides that teachers are "valuable sources of evidence for assessing impairment severity and functioning" inasmuch as they often "have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." 2006 WL 2329939, at *3 (S.S.A. Aug. 9, 2006). As such, Carter's opinion may not be discounted on the basis that she is not an acceptable medical source.

The ALJ also discounted Carter's opinion because it was on an issue reserved to the Commissioner. But SSR 06-03p recognizes that information from teachers may provide insight into the severity of the alleged impairments and how they affect the individual's ability to function. The Individualized Functional Assessment form that Carter filled out expressly includes detailed definitions of the domains, sets out the criteria for an "extreme" limitation, and provides space for additional comments, which Carter used. Although it is up to the Commissioner to decide whether J.G. is disabled, Carter's opinion at least provides valuable insight into the severity of J.G.'s alleged impairments and how they affect his ability to function.

The ALJ discounted Carter's opinion that J.G. was extremely limited in acquiring and using information, because J.G. was promoted to the third grade, the Computer teacher observed that J.G. was self-challenging and progressing with computer usage, and Carter described J.G.'s

problems with the effect of his behavior on his academics merely as a "struggle." The ALJ's decision to discount Carter's opinion is not supported by substantial evidence on the whole record. For elementary school-aged children (6 to 12 years old), the domain of acquiring and using information involves the ability to learn to read, write, and do math, and discuss history and science; using these skills in academic situations to demonstrate what has been learned; using these skills in daily living situations at home and in the community; and using increasingly complex language to share information and ideas with individuals or groups, by asking questions and expressing the child's own ideas, and by understanding and responding to the opinions of others. 20 C.F.R. § 416.926a.

Carter was J.G.'s special education teacher for Communications, Math, Science, and Social Studies during his second grade year. Her opinion about limitations in the ability to acquire and use information is consistent with evidence showing J.G. was making only slow progress toward academic goals during second grade; had declining grades in Communications, Math, and Science; had failed to make progress toward his behavior goal as of the end of second grade; the fact that his medication only helped for part of the school day; his two suspensions for fighting and chronic misconduct; the numerous modifications and accommodations he required throughout the school day; and Carter's documentation on J.G.'s year-end report card that he needed improvement in the areas of persistence, self-discipline, following directions, sense of responsibility to others, and self-control, and that he did not work at grade level. It is also consistent with the testing performed in connection with the November 2013 I.E.P. assessment, which showed significantly inappropriate behavior, as well as cognitive ability in the low-average range; a deficit in processing speed; academic achievement in the sixth percentile and consistent with grade level 1; deficits in all areas of reading ability; poor written expression skills; and below-average skills in math. J.G. continued to require an I.E.P. in the third grade,

with goals in all academic subjects as well as behavior; continued to require accommodations in all subjects; and could not participate in a regular classroom full time. In short, the evidence is consistent with Carter's comment that J.G. did "struggle" academically due to his behavior. Advancing to third grade and having some success in using computers is not substantial evidence on the whole record demonstrating J.G. has no limitations in acquiring and using information. *See A.S. v. Astrue,* 2009 WL 1576844, at *8-9 (E.D. Mo. June 3, 2009) (child's advancement to the next grade was not substantial evidence on the whole record that he did not have a marked limitation in acquiring and using information).[4]

Other opinion evidence in the record does not change the analysis. Neill Reilly, M.A. performed a consultative evaluation of J.G. in January 2013, when J.G. was in first grade. Reilly acknowledged that it was "too early to tell if" J.G. had learning disabilities. The ALJ gave significant weight only to Reilly's observation of J.G.'s mental status, *i.e.*, that J.G. was a little fidgety; he appeared to have a good relationship with his mother and her boyfriend; he demonstrated appropriate judgment; and his mood appeared to be within normal limits. Later in January 2013, two state agency consultants reviewed the records, including the Reilly evaluation, and opined, among other things, that he had no limitations in acquiring and using information, and less than marked limitations in attending and completing tasks. They acknowledged that J.G. "struggles in some areas due to his conditions," and concluded that his "condition is not

---

[4] The ALJ also discounted Carter's opinion that J.G. had less than marked limitations in moving about and manipulating objects, as inconsistent with the ALJ's conclusion that J.G. was athletic, *e.g.,* he liked to ride his bicycle and climb trees. A less than marked limitation cannot trigger a finding of disability under the regulations, so even if the ALJ's conclusion in this respect is unsupported, it did not affect the outcome and therefore does not suffice as a basis for reversal of the decision. The Court nonetheless notes that both gross and fine motor skills are aspects of this domain. *See* 20 C.F.R. § 416.926a (ii) ("Moving and manipulating things involves several different kinds of actions: Engaging your upper and lower body to push, pull, lift, or carry objects from one place to another; controlling your shoulders, arms, and hands to hold or transfer objects; coordinating your eyes and hands to manipulate small objects or parts of objects.") The record reflects hat J.G. received special services for help with handwriting, a fine motor skill.

disabling *at this time* because it does not significantly interfere with his ability to function." Tr. 74 (emphasis added). The opinions were rendered over a year before Carter's, before the I.E.P. assessments, and before documentation of J.G.'s academic and behavior struggles in the second and third grades. The Court cannot conclude that the Reilly and state agency consultants' opinion evidence, which was rendered more remotely in time in J.G.'s young life than Carter's opinion, and is, by their own description, qualified in terms of time ("too early to tell" and "at this time"), is substantial evidence on the whole record supporting the ALJ's decision to discount Carter's opinion about J.G.'s limitation in acquiring and using information. *See Frankl v. Shalala,* 47 F.3d 935, 939 (8th Cir. 1995) (ALJ erred in relying on remote medical evidence to determine RFC; RFC must reflect claimant's functional abilities at time of hearing); *Morse v. Shalala,* 32 F.3d 1228, 1230–31 (8th Cir. 1994) (ALJ erred by relying on old medical report and giving no weight to subsequent supporting evidence); and *Mayo ex rel. D.L. v. Astrue,* 4:11–CV201 LMB, 2012 WL 996580 (E.D.Mo. March 22, 2012) (remanding where the only medical evidence supporting the ALJ's finding that the claimant had a less-than-marked limitation was over a year old and submitted by consultative psychologists who did not have the benefit of the majority of the records before them).

The ALJ's decision to discount Carter's opinions is unsupported by substantial evidence on the whole record.

### D. The first domain finding

The ALJ concluded that J.G. had no limitation in first domain, acquiring and using information, because J.G.'s speech is understandable, he is progressing in school, formal testing showed his cognitive ability to be within the average range, and he demonstrated progress and even self-challenged in the area of computers. Tr. 24. Wilson argues that the conclusion is unsupported by substantial evidence on the whole record. The Court agrees.

The evidence regarding J.G.'s struggles with school progress, including the use of computers, was discussed in the preceding section and that discussion will not be reiterated. In short, substantial evidence on the whole record does not support the conclusion that J.G.'s school progress shows no limitation in the domain of acquiring and using information. The Court will add that the ALJ also failed to compare J.G.'s functioning with that of other, unimpaired children his age, although required to do so in evaluating whether a child has limitations in the domains. 20 C.F.R. § 416.926a(f)(1).

As for J.G.'s cognitive testing, while it showed he had scores in the low average range, even average cognitive ability is not substantial evidence that a child has no limitations in the domain of acquiring and using information. *Lawson ex rel. D.D.L. v. Astrue,* 2009 2143754, at *10 (E.D. Mo. July 13, 2009). *See also* SSR 09-03p, 2009 WL 396025, at *3 (achievement test scores are considered when evaluating the first domain, but are not the sole source of information to be used in evaluating it). Moreover, as noted in the preceding section, testing showed J.G. had deficits in processing speed and written expression, among other things.

Finally, the Court cannot conclude, on the basis of the whole record, that having understandable speech means J.G. has no limitation in acquiring and using information. The domain involves more than ability to speak understandably.

The Commissioner says that J.G.'s special education diagnosis was for emotional disturbance, not a learning disorder, and that J.G.'s most recent I.E.P. shows that he can reason; is good at mental math, puzzles, and assembling things; enjoys science explorations; can tell time; has neat handwriting; has clear speech; has logical and organized thoughts; and has acceptive and expressive language skills that are within normal limits. The Commissioner argues that this evidence shows no more than "some" limitations, not disabling ones. But the ALJ did not rely on such evidence in concluding that J.G. had "no" limitations. Furthermore, it

is unclear from the record to what extent the factors the Commissioner now cites affect J.G.'s ability to function within the six domains. For example, all of the opinion evidence in the record precedes the preparation of J.G.'s most recent I.E.P.

The ALJ's conclusion that J.G. had no limitations in the first domain is unsupported by substantial evidence on the whole record.

**F.  Remand**

Wilson asks for remand for further proceedings. The Court concludes that remand is necessary for further development of the record, consistent with the above discussion.

The Court additionally notes that there is no current opinion from an acceptable medical source in the record. The consultative evaluation and the state agency reviews in the record were performed in 2013. The opinion of a consulting physician or other professional who examines a claimant once or not at all does not generally constitute substantial evidence. *Vossen v. Astrue,* 612 F.3d 1011, 1016 (8th Cir. 2010). Also, the opinions were prepared before J.G.'s I.E.P. assessments, and more recent second- and third-grade experiences. *See Mayo,* 2012 WL 996580 (remanding where the only medical evidence supporting the ALJ's finding that the claimant had a less-than-marked limitation was over a year old and submitted by consultative psychologists who did not have the benefit of the majority of the records before them). Further, while the record showed that J.G. showed some progress in the third grade, it is unclear to what extent that progress affects his ability to function within the six domains. Accordingly, on remand the ALJ shall obtain an opinion from an acceptable source and weigh the opinion in accordance with the regulations and Eighth Circuit precedent.

## III.     Conclusion

The Commissioner's decision is reversed and the case is remanded for further proceedings.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated:   April 25 , 2017  
Jefferson City, Missouri